Let's see. We'll take up number. We'll take up Kinnerick versus Kobyan versus John Ashcroft. Ready on that. All right. You may proceed. Good morning, Janice. My name is Asif Isikanyan. I represent the petitioners in this case. Okay. This is an asylum case, and looking at the immigration judge's decision, we believe that a few errors were committed. First, the immigration judge says that the petitioners do not qualify for asylum based on that they were resettled Originally, they were born in Iran, and they firmly resettled in Armenia. We believe that's incorrect. It's correct as far as being born in Iran and resettled in Armenia. But the claim is from Armenia. The fact that they're firmly resettled, in fact, supports their claim because they're seeking asylum from the place where they've been firmly resettled. I understand that. Let me ask you something which goes to the adverse credibility finding, which to me is the only troublesome part of the case. Is there anything on the record? Or is there any other way I can get at information as to whether, in fact, it's customary in Armenia not to sign letters? The IJ said one of the reasons that the IJ didn't trust that letter was that there was no signature. Is there any way I can find out whether that's in fact customary not to sign letters in Armenia? It's very hard to say, Your Honor. I don't believe it's always customary that you sign letters without putting your name on it. But I believe that I've seen letters without names on it. But as far as it's very hard to say that that's always done. And I don't know what documents I could refer to as far as to prove that that's customary. OK. And second, as to that letter, there was an attempt to introduce an envelope that purportedly was the envelope in which the letter came. But the IJ didn't want to admit it. That's correct. So when the IJ later says there's no envelope, well, there was an envelope that the IJ didn't admit. Whether, in fact, it's the same envelope that the letter in, I guess, may be open to some question. But there was an attempt to introduce that envelope. That's true. Well, initially it wasn't attempted to be introduced because they didn't feel it was necessary to introduce the envelope. But when the issue came up as far as the letter, then they attempted to introduce the evidence and the judge denied the introduction. Yes. Yes. And can you help me? Is there any the date on the letter is wrong? Is there any anything other than just the fact that it's wrong? Is there any reason, anything that helps us understand why it might have been wrong? Your Honor, I don't know as far as why the date on the letter was wrong. I think if it was fabricated or it was made up, they would have definitely made sure that that at least was the correct date on the letter. That would be if they wanted to create a letter just for the evidence. Then you never know. You know, sometimes the stories are too good instead of not good enough. This letter is clearly not too good. Well, it's good enough. I don't know. But it's not not one of those too good, too perfect. Yeah. Well, if a letter is too good, then I think there'll be more questions. Do you need in order to establish the claim? Do you need the information in the letter? Well, it shows that the government has come back looking for them. And it also helps as far as the I.J. had a question as far as if the government was persecuting them. Is there enough evidence without the letter to establish that the government is behind the persecution and that it's a reasonable inference the government might still be after them? That's correct. Well, how is there information that the government is behind the persecution? There's what's showing is that this is government persecution. There's no solid evidence as far as that it was government persecution, except for we can infer certain things from the facts. First, that this person who was shot, Edward Hovhannessian, was shot because of his political affiliation with the ship. Well, you don't know who did the shooting. I mean, you can infer that, but that's not a necessary. You don't have to necessarily infer that someone was shot. But there's no showing that the person that shot, that fired the shot was a government member of the secret police or that the shot was with government countenance. There's no showing of that, is there? No, Your Honor. And also there's no showing that after she was threatened that she complained to the government about this. Her husband was a government official, as a matter of fact, a pretty high government official. And she never reported that to the government. And her husband, who's a high government official himself, never reported that to the government. That's true. So can't the I.J. then find that her credibility is somewhat shaky? Well, he probably could, but I don't think that's strong enough because I believe there was... She sincerely believes that the government was after this person. And I think the letter helps a lot showing that as far as that they came back trying to find them. And the letter also indicates why they came back. So I think there's no solid evidence to show that the government was really after them. Nobody ever told them that this is the government, that it was doing it. And as far as not reporting to the authorities, if you believe that it's the authorities who are doing it, you wouldn't even go back to them to report to them. That's true, but her husband has a very high position in government. And he did not make any effort to find out what was going on. Well, I believe also, even though it's not in the record... Well, if it's not in the record, I don't want to hear it, quite frankly. Let me ask this. Why would the... The IJ just didn't credit your client, is that correct? It's not only the credibility, but there were a few issues. One was the statutory asylum, that they did not fall into the statute as far as asylum. There was credibility issues. There was also if government was the one who was persecuting them, and also if they could safely relocate in another part of the country. Well, you have to show a future for asylum. Right. And what testimony was there at that time, before the IJ, that she had a well-founded fear of future persecution? Well, I think past persecution kind of shows that there's a possibility of future persecution. I believe the burden then shifts on the government to show that the conditions in Armenia have changed, that there won't be any future persecution. Well, but if the IJ didn't credit her testimony concerning that there was government persecution to begin with, what if any evidence of the question is why should the burden shift at that point if he doesn't credit her testimony? She didn't put any testimony on her own concerning any future persecution, did she? Well, the letter showed future persecution. The letter that she received that the government was still looking for her. Why – what is her best – she never gave a reason why she did not have the postmark for the letter, and the letter itself is somewhat ambiguous concerning the dates and so forth. Why didn't she testify, and why did she have the postmark of that letter? Postmark meaning on the envelope? Yes. They tried to introduce into evidence the envelope, but the judge denied that. Well, why didn't they mark it for identification? Well, he refused to even accept it. If he doesn't want to accept it in evidence, you can still have it marked for identification. I believe the counsel for the petitioners at that time tried to introduce – the judge would not even take the envelope to even mark it for identification. Well, I don't understand that. If something is asked to be marked for identification, the judge has no ability not to have it marked for identification if you ask the judge to mark it and not to receive it in evidence. Your Honor, I've practiced immigration law in front of this judge numerous times, and I won't be surprised. He, in fact, will not accept certain evidence during the trial. I'm not talking about evidence now. I've tried a lot of cases, and I don't accept things for evidence, but the lawyers have an absolute right to mark what they're trying to put into evidence for identification. All right. Okay. I have it here. Oh, I thought you had a question. No, no. I'm sorry. I may have someone. After I've heard from the government, I may have some questions. All right. Well, I believe the most important thing, as Your Honors have brought it up, is the credibility issue. And if we overcome that credibility issue, I think the other ones are much easier to overcome. Unfortunately, with credibility, and I've practiced over 100 cases in front of immigration judges, there are a lot of problems. First of all, language barriers. The interpreters. Certain meanings in certain words, I mean, in certain language, mean completely different when it's translated. Sometimes interpreters will just paraphrase certain sentences. And I think most problems, as far as when credibility is the problem, is because of the language barrier. The judge indicates and puts it in detail as far as where the inconsistencies are. Like, for example, he says that in your application it does not indicate that they tried to kill you, but in the application it states that he was threatened. Now, threatened could be that you'll be killed. Now, there's another incident where the judge says that initially she says that she was at her mom's house, then later on says that the cousin was at the house. In fact, she says that they moved to the mom's house initially when they were threatened, and now that the cousin has sent them the letter, the cousin is living in their house. It wasn't changed. I mean, I think the IJ misunderstood them. So I don't think there were any major inconsistencies or discrepancies that could be considered as incredible. Why did she testify that first that she was going to be killed, and later on she testified that life would be made difficult? That's a little different, maybe subtly. One is veiled, but you don't see that as a contradiction? It could be, Your Honor, but when you continuously ask the same question over and over again, there's a possibility if you have said that you are going to be threatened, there might be a possibility that you might say, well, they might have said more than just one sentence saying I'll kill you or I'll threaten you. Maybe the first time when asked, she said that they told me that they're going to kill me. The second time when asked, she said the second sentence maybe. Well, that's not her testimony. She said that the IJ said that at one time she said the threat was she was going to be killed if she didn't kill her patient. And on a separate occasion, she didn't say that she was threatened to be killed. She was threatened that life would be made difficult or something. Well, that's a big difference to me. And maybe I would have credited her. Maybe I would have said, oh, that's a, you know, six of one half does the other. But is that clearly erroneous for an IJ to look at the difference and say that makes no difference or it is a difference? Well, it is a difference. But as far as if it's the amount of weight that the IJ gave to it, I don't believe it should have been given that much weight, negative weight. Because I think the IJ should have asked her to clarify why you said you're going to be killed, and the second time you're saying that differently. And maybe she would have had an answer to that. Let me ask something. What do you want this panel to do? You certainly, you didn't prove torture here, future fear of torture. She was never tortured before. You never proved that. You haven't seriously argued that in your brief. Well, I believe if there is a past persecution, then there is a possibility of future persecution. Well, possibility. All right. Are you seeking asylum or withholding here? Actually, asylum, Your Honor. All right. So, in other words, you're saying that the Attorney General should determine whether or not she should be allowed to stay. Would, if we don't agree, you think that we should reverse the, well, the BIA signed off on the IJ in this case and find that the facts show, clearly show that she proved asylum, entitlement to asylum. That's what I'm requesting. If we don't agree with that, do you have any objection if we were to remand it back to the IJ for further development of the record in fact-finding? No, Your Honor. I have no objection. I think it would help us a lot. You're not seeking withholding of- Well, initially, we were seeking asylum, withholding, and convention against torture. And withholding is still one of the options. So, if it's going to be remanded, we definitely would. I mean, it's a higher burden as far as withholding goes. If we can't prove to the court that we have an asylum claim, it's going to be much harder to prove that- Well, if it were remanded, you want the ability to be able to show there's a substantial likelihood of future persecution. That's correct, Your Honor. Okay. I understand.  Thank you. Thank you, Your Honor. Good morning, gentlemen. May it please the Court, my name is Stephen Flanagan. I represent the respondents in this case. Just as a preliminary note, discussing the letter, whether or not that was submitted, on page 158 of the administrative record, we've got the conversation between the immigration judge and petitioner's counsel at the time regarding the letter. And the immigration judge says, well, counsel, that's your theory. You can't say that the person who wrote the letter made a mistake on the date that he signed it. Petitioner's attorney, I have the original envelope. Immigration judge, well, that envelope may or may not be what this document came in. That could have come in some other envelope. Petitioner's attorney, I understand that, Your Honor. So petitioner never actually moved to have the envelope admitted into the record for identification or otherwise. But I think the more important here, the more important issue, preliminary issue to discuss is. But the envelope didn't have a postmark? I don't know, sir. You don't know? No, sir. And what would be the relevance of the, if it were postmarked? Well, the letters dated May 2nd, 1999. Before she left to Armenia. Before she left and before. But after the threat. And before the victim was even out of the hospital. Because he wasn't released until May 10th, 1999. But after the threat. The threat, yeah, the threat was on April. No, the threat was, yeah, April 16th. So the letter, I mean, the letter, if you believe her, was evidence that she was threatened. No, the letter has nothing to do. Well, the letter, all the letter says is that this Hapnoshian, who was in the hospital, was killed two months after they left. And also says that national security police came by their house and asked where petitioners were. That's all the letter says. So the date cannot be accurate if the letter is telling the truth. That is to say, the letter is stating things that happened well after the 1999 date. Exactly. Yeah, sure. Exactly. Which also says that goes to the credibility of the letter. Could just be a bad lie. I think it's a pretty preposterous lie. I mean, why would you, I mean, if you're going to concoct a lie, this is a really stupid way to do it. It's true, sir, but in the heat of the moment, there's a number of other inconsistencies that also undermine their claim. Would you go through those? I would be, because for me, the real question, the heart of the case for me is the credibility finding. Does this court want to at all discuss waiver and abandonment as far as the petitioner's brief? I've seen so many bad briefs in INS cases. I'm not, maybe my colleagues are, but I'm not. You've probably seen a few briefs, too. Yes, sir. But I mean, this is to the extreme where basically all you have to do is print out the immigration law outline that's on the 9th So you've got to do that.     But it's true, I mean, I think the court doesn't care. And that constitutes an argument in a brief. Well, at least it was short. I would like to, you know, basically, your waiver argument is that if it wasn't brought up down below, it's not before us, is that it? No, it's not in their brief to this Court, sir.  I mean, like we're showing up here for oral argument, kind of. I mean, it's a guesswork for us as to what they're going to come in and argue. No, it's not. You know darn well what they're going to argue. They didn't state it in their brief. But I mean, these cases are so routine. But, sir, you just said here that there was problems with interpretation. And I've never heard that. I mean, we have a lot. Stick around. Stick around. We have some other cases. I've heard it, but not in the context of this case. Yeah. I mean, you must do immigration cases all the time, right? Yes, sir. Do you make a routine objection to briefs? I mean, that must be sort of boilerplate in your briefs if you're objecting to arguments because the brief isn't much good. Well, it depends on the competence of the brief, obviously. But this is fairly – I haven't seen as general a brief as this one in quite some time, if ever. Okay. In any event, I don't want my colleagues to view it. My view is I'd prefer to address this on the merits. Well, I mean, for immigration judges, the standard of practice is very, very, very low for attorneys or whoever. That's right, isn't it? It varies, sir. Well, you can be a disbarred lawyer and practice before the immigration court. That's true, sir. Okay. So you're telling me the standards are high, then? No, what I'm saying, though, sir, is you can't be a disbarred attorney to appear before this court in order to focus the issues. And, I mean, right now it's a fishing expedition for us when we walk in here. And I understand, sir – I mean – All right, why don't we hear it on the merits? As far as the adverse credibility? What do you want to hear? I'd say, first off, one thing just – and it doesn't necessarily go to the heart of the claim, but it's just another inconsistency. She said that the letter was written by the cousin who presently lives in their house. First off, a petitioner, a female petitioner, said that the letter was written by her husband's friend. And then she later said, oh, it was the cousin that wrote it. Additionally, she said that her husband's parents presently lived in their house. Then she changed it and said, no, it was her husband's cousins who lived in the house. Then finally she said, no, it was her husband's parents once lived with them in their house. So that's a minor thing, but particularly telling is her incredible testimony that this individual came in to bribe her to kill this patient, the patient she was treating, yet she did not in any way feel compelled to inform this patient. Well, as a doctor, she may not want to upset the patient. That's one thing. More compelling to me is she didn't tell her. Her husband never complained to anyone in government. And as a high-ranking official who reported directly to the, as he called it, president of the city. What was his job? He was, according to him, he was an economist and advised the president on economic matters. On the other hand, he's an economist, whatever that is, in Armenia, in city government. And here you're dealing with secret police from the Armenian, whatever, you know, the national police. But once again, that's speculative. There's no evidence that the government was any way, shape or form involved in this. I mean, that's. Well, no, there is. There is evidence in the age. I chose not to believe it. I mean, she testified that this was the government secret police based on her speculations. But you see, her testimony is, of course, evidence. And you can say it's not worth very much. But there is evidence. Yes, there is evidence. But I'm just the way that evidence should be given when it when she admitted that it was pure speculation on her part. She never said this is pure speculation. She said, I believe. OK, sir. All right. Am I correct in saying that she never said it was pure speculation? She said, yes, she did say that she believed it. Her husband, in fact, specifically said that it could be speculation. Can you point me to the record where he said that? It's in the record that she thought the guy was definitely a secret policeman. I think that was in the briefs. But I'm interested in your pointing to me in the record where the husband says it's speculation. Just a moment, sir. Thank you. All right. All right. Well, it may not be there. I can reread his testimony, but I don't recollect him having said that. Basically, what he says is one. What he says was, are you reading now? Yes. What page are you on? That'd be on page 243. Hang on a second. I'll catch up with you. OK, I'm with you. I'm on that page. Aside from that, did you have any problems with the police or the government? No, no, no. Who would they kill? Maybe me, maybe my wife, maybe both. And again, they being who? Those people who had ties with the incident with the patient. I mean, in effect, he's saying we have no idea. That's not what he said. He's saying he never identifies it as national security or any kind of governmental agent that's doing this. But she has already done so. And he does not say I have no idea. He says what you just read. Which perhaps my interpretation, obviously my interpretation of that language is different than yours, sir. Well, let's put it this way. The guy that she's treating, her patient, is politically active. And he's politically active against the government that was presently in power there in Armenia, right? Yes. No question about that. And he's a thorn in the side of the government. Obviously, because he's, you know, politicizing against the government. He doesn't like the government. He's trying to overthrow the government through democratic processes, I guess. And someone comes and tells her, like, you better kill this guy or your life is not going to be so wholesome hereafter. And a month later, she gets shot at. Now, if that happened to you, wouldn't you connect up that maybe the government doesn't like me? I think it's possible to draw that conclusion. Possible? Possible, yes. Yeah, I tell you, that's. I mean, we're also talking about a country where, admittedly, there was gunshots everywhere, but a random shot in a parking lot. I mean, that's the sole instance. It hit her car, didn't it? It depends. It either grazed her car or bumper. It touched her car. OK. So a single random shot in a parking lot. It takes one to kill you. You know, it doesn't sound all that random. There is any number of things that it could be attributed to. It's that's one possibility. But there are any other number of possibilities. So what would you think? If someone. If someone said to you, and you're a doctor, you better kill this person or else bad things will happen to you. And then you resist doing that. You don't do it. And first of all, you tell them that you can't do it because of your oath or whatever. And then you're in the parking lot and the shot's fired in your direction. You're going to your car and it hits your car. What would you think? My initial thought would be perhaps this individual. Whoever threatened me is trying to kill me. So but addressing the reasonableness of that belief. If my husband was, as he said, a high ranking official with the government. Well, how you know, he's an economist for the city. How does that make him a high ranking official for the government? He described he may come in someday with with unhappy economic data and then end up on the streets. He described himself as a high ranking official. You know, I never recollect him using those words. I'm not sure I want to force you to go back to the record and point out where you say he's high ranking official. But I do not recollect him having stated that in those terms. And obviously I could I could specifically identify that and give it to the court at a later time. But following that, if I continue to live in the country for another three and a half months, if the government secret agency is out there looking for me and wants to kill me, arguably they can't accomplish that. Would there be anything wrong, and I'm not saying that I'm not talking as to any disposition we're making here, since the fact finding here may not be in the highest traditions of the immigration court, would there be anything wrong with remanding this back for further development of the record and findings of facts and conclusions of law in classical, better form? Either for the government or for the petitioner? I don't see the merit in remanding. I don't think there's any more evidence that could be elicited. I mean, their evidence was inconsistent, contradictory, and implausible in places. And as the IJ found, one, they didn't write asylum because their claim was their testimony was incredible. And two, even if we assume that the government did in fact threaten her and she was shot at, she can't show that this was on account of any protected ground, unless we're going to identify physicians who refused to kill their patients as a particular social group. So even if we assume everything to be the case, it still was not persecution. One, assuming the single shot was persecution. And two, even if we assume it's persecution, then it wasn't on account of any protected ground. She was apolitical and she had no other ties to the government. I mean, this was solely because she refused to kill one of her patients. So on that basis, she can't show that she's entitled to protections of asylum because it wasn't on account of a protected ground. Well, I mean, wasn't she saying that her patient was injured by the government's secret agency who shot him? That's what she said, yes, sir. But she herself was not targeted for any other reason, assuming her testimony to be credible. She was not targeted for any other reason. Well, you know, she was taking the position, contrary to that, if you believe what she says, contrary to that, of the government. Who wanted this guy out of the way. But that contrary position wasn't due to her political opinion. Well, she's expressing, in a sense, her political opinion, and that's contrary to the government's position about assassinating people. Sir, she said that she wouldn't kill him because of her, you know, the Hippocratic oath and her obligations as a physician. It had nothing to do with politics. Oh, yeah? Well, I mean, that's what she said. Well. When she arrived at the hospital parking lot with her car, someone shot at her and tried to kill her. I mean, I understand and agree with your position up to this point. That is to say, merely because a doctor chooses to follow the commands of the oath and doesn't kill patients, obviously, that doesn't make it political. Yet, assuming for the purposes of what I'm about to say, that her testimony is truthful, when a secret agent of the government comes and says, I'd like you to kill this person, and she says, I won't do it. And he then threatens her with bad things, possibly including death. A month or so later, she's shot at, and she believes it's by the same people, whether the same particular individual.  At that point, I think it's at least a plausible argument that this has turned into something political, because she set herself up against the government, and the government has chosen to treat her as an adversary, and she has maintained her position in the face of the government's death threats. Why is that not, at that point, political? It doesn't start out that way. She just says, listen, I'm going to do my job. But it ends up that way. It's like they call that imputed. Well, I don't think, I mean, it'd be a leap to say that they imputed a contrary. I mean, she took a contrary position, but it wasn't on account of politics or anything like that. It was simply, as mentioned, her position as a physician. Let's change this to a pure hypothetical. Saddam Hussein, in Iraq, during the time that he was actually in charge of Iraq, comes to somebody and says, I'd like you to do a political assassination for me. And the person says, I don't want to do a political assassination. I'm not a doctor, and I'm also not an assassin. I'm just an ordinary person. I think it's wrong. I'm not going to do it. And he says, well, I'm going to kill you if you don't. And that person comes to the United States seeking asylum. What happens? In that regard, just because they're opposed to? Just because they don't like to do political assassinations, and Saddam said, I'm going to kill you if you don't. There's no ground for asylum in that circumstance? There would be a ground for asylum. But if there is ground for asylum there, why not here? And I guess perhaps the argument I was making, I mean, that is under the technical, under the specific terms of the INA. She hasn't shown that was on protected ground. I understand what you're saying, sir. But, I mean, we're building, we're kind of building in order to get to that point. You know, there's a number of steps we have to do, a number of assumptions and a number of others. For the purpose of my question, I was assuming that it's all true. And I understand that we have a serious difficulty about whether we agree with or sustain the adverse credibility finding. But for the purpose of that question, just assume everything she says is true. I have trouble distinguishing analytically from my Saddam Hussein example. So would that single, if the single shot, would that constitute, would that qualify for asylum? No, no, no. It's quite a different question. You are saying that she refuses to kill the patient. She's threatened with death if she doesn't kill the patient. She is shot at because she doesn't kill the patient. And she says, I'm out of here. And she never goes back. And that strikes me, if the story is true and if the threat is real, that that's a ground for asylum. That's a protected ground. Now, whether the story is true is, of course, an entirely separate question. That's the more troublesome aspect of the case to me. All right, sir. And, you know, obviously I've been resistant, but I concede that. Okay. Well, your entire argument really is based on credibility. Does it rise or fall on credibility? And the issue before us is whether or not the credibility call was adequately and properly made by the I.J. Isn't that the bottom line of your, isn't that really your defense, your position? That was the credibility issue was the primary basis for the immigration judge's decision. And your backup position is what? That one, the single shot doesn't constitute, one single shot doesn't constitute persecution. And furthermore, she was able to safely relocate within the country. She lived for three and a half months, 25 minutes away from the city with no further difficulties or problems. Having moved out of her primary residence. It's true. Well, she was able to, she was able to depart the country. But she laid low when she departed. She didn't. Well, according to her husband, he continued to investigate. I'm talking about her. She didn't display herself to too widely in her new location. That's pretty much holed up there. That's what her testimony is. That's what her testimony is. But she was still able to obtain exit documents from the country. If the secret police was seriously in pursuit of her, she'd have to skyline herself to get those exit documents. Her family, her entire family continues to reside in Armenia. There's a number of things that the government could do if they, in fact, wanted to track her down. So in that regard, it kind of definitely undercuts her claim of persecution. Well, she went to, she and her husband were in prison at one time, weren't they? That's true, sir. In 1996, they were arrested and detained for four days. Four years before this incident. Right. Yeah. Well, three years. Well, they don't claim that that is related in any way to this at all. That wasn't their position at all. No, sir. In fact, they stated that that had no bearing on their decision to leave Armenia. Any further, gentlemen? I guess. Is there anything else? No, sir. Thank you very much. Thank you. All right. You want to say anything else? Just briefly. The government indicated, and it's my reputation when it's stated that it's like a boiling plate brief. It's true. It's kind of very short. And the reason, twice they had to prepare the administrative record. Once was in November 15. They failed to do it. It was continued to January 22. Again, they failed to do it. I had a briefing scheduled for March 3, and they had not requested any continuance as far as preparing the administrative record. And I did not want to pass the deadline, so I had to prepare a brief as good as possible to respond to his argument that my briefing was not good enough. And they filed the administrative record. March 24. Okay. Thank you. Hey, can I ask something? What was your retainer to represent her on the appeal to the Court of Appeals from? My judge charge? Yes. $750 plus, including the filing fee. $750 plus cost? No, including. Oh, including the filing fee. I do not do Ninth Circuit cases. I've done a lot of immigration cases. I've even done pro bono cases. I am concerned about immigrants, especially because I am an immigrant myself. And sometimes some judges are extremely good at immigration. Some are not. And it's very unfortunate they don't give them the opportunity. And when the BIA started sending all these cases back in September of last year, there was like 50 Los Angeles Times had an article in their paper where it said a judge decided 50 cases in a single day. And I filed these as pro se, even this case as pro se. And then the court ordered that I be the attorney of record. And I went on as being the attorney of record. I didn't charge them additional money. I'm not even charging them any money appearing today. The only suggestion I might make is to the brief. Actually, your brief is fairly detailed in terms of recounting the testimony. And the only possible argument against the brief, and it's a real one, is that you didn't then make the legal arguments coming out of it. But, in fact, your recounting of the testimony is more thorough than I get in many briefs. The problem, to the degree that there is one, is that the legal arguments are not then outlined. So I do not intend sort of a wholesale condemnation of the brief. Thank you. Any more questions? It could be organized better. I'm saying I didn't have the administrative record, and I didn't want to blow the deadline. Sure. Thank you. Thank you. All right. Matter is submitted. All right. We come to Conway v. Gary Lewis.
judges: Pregerson, Cowen , W. Fletcher